**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**
**Oakland Venue**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| vs. | ) | **PRESENTENCE INVESTIGATION REPORT** |
| | ) | |
| | ) | **Docket No.:   0971 4:17CR00295-001 HSG** |
| **SALEEM MOHAMMAD KHAN** | ) | |
| | ) | |

**Prepared for:**     The Honorable Haywood S. Gilliam Jr.
                              United States District Judge

**Prepared by:**     Jessica A. Goldsberry
                              U.S. Probation Officer Specialist
                              Oakland, CA
                              Work: (510) 637-3623
                              Fax:   (415) 581-7432
                              jessica_goldsberry@canp.uscourts.gov

**Assistant U.S. Attorney**                          **Defense Counsel**
Kyle  Waldinger                                            Christopher  Cannon  (Appointed)
450 Golden Gate Ave.                                   180 Montgomery Street, Suite 2350
Box 36055                                                    San Francisco, CA 94104
San Francisco, CA 94102                              (415) 362-6252
(415) 436-7200                                            chris@sugarmanandcannon.com
kyle.waldinger@usdoj.gov

**Sentence Date:**     June 24, 2019, at 2:00 PM

**Offense:**                **Count 1**:
                              Conspiracy to Commit Securities Fraud
                              18 U.S.C. § 1349
                              Not more than 25 years imprisonment/$250,000 fine
                              Not more than 5 years supervised release
                              (Class B Felony)

                              **Counts 2-10**:
                              Securities Fraud
                              18 U.S.C. § 1348
                              Not more than 25 years imprisonment/$250,000 fine
                              Not more than 5 years supervised release
                              (Class B Felony)

**Release Status:**     May 31, 2017, arrested and released on a personal recognizance bond.

Date Report Prepared:  May 20, 2019                    Date Report Disclosed: June 10, 2019

Re:  Khan, Saleem (41918)                                                                                     Page 2

**Detainers:**          None.

**Codefendants:**     None.

**Related Cases:**    Roshanlal Chaganlal CR 17-00385 HSG

Re:  Khan, Saleem (41918)                                                                                               Page 3

**Identifying Data:**

| | |
|---|---|
| **Date of Birth:** | May 2, 1964 |
| **Age:** | 55 |
| **Race:** | Asian |
| **Hispanic Origin:** | Non-Hispanic origin |
| **Sex:** | Male |

| | |
|---|---|
| **SSN#:** | 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 |
| **FBI#:** | 420086TD0 |
| **USM#:** | 17870-111 |
| **State ID#:** | None |
| **ICE#:** | A 71950588 |
| **PACTS#:** | 41918 |

| | |
|---|---|
| **Education:** | Master's Degree |
| **Dependents:** | 3 |
| **Citizenship:** | U.S. Citizen |
| **Immigration Status:** | Naturalized U.S. Citizen |
| **Country of Birth:** | Pakistan |
| **Place of Birth:** | Tanda, Pakistan |

| | |
|---|---|
| **Legal Address:** | 5896 Annandale Way<br>Dublin, California 94568 |
| **Residence Address:** | 5896 Annandale Way<br>Dublin, California 94568 |

| | |
|---|---|
| **Alias(es):** | Also Known As: Khan, Saleem Mohammed |

| | |
|---|---|
| **Alternate IDs:** | None. |

***Restrictions on Use and Redisclosure of Presentence Investigation Report.*** Disclosure of this presentence investigation report to the Federal Bureau of Prisons and redisclosure by the Bureau of Prisons is authorized by the United States District Court solely to assist administering the offender's prison sentence (i.e., classification, designation, programming, sentence calculation, pre-release planning, escape apprehension, prison disturbance response, sentence commutation, or pardon) and other limited purposes, including deportation proceedings and  federal investigations directly related to terrorist activities. If this presentence investigation report is redisclosed by the Federal Bureau of Prisons upon completion of its sentence administration function, the report must be returned to the Federal Bureau of Prisons or destroyed. It is the policy of the federal judiciary and the Department of Justice that further redisclosure of the presentence investigation report is prohibited without the consent of the sentencing judge.

Re:  Khan, Saleem (41918)                                                                 Page 4

## PART A. THE OFFENSE

### Charge(s) and Conviction(s)

1.  On May 25, 2017, an eight-count Indictment was filed in the Northern District of California, charging the defendant, Saleem Khan, with violations of 18 U.S.C. § 1349 – Conspiracy to Commit Securities Fraud (Count One) and 18 U.S.C. § 1348 – Securities Fraud (Counts Two – Eight); and a Forfeiture Allegation was included pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461.

2.  On November 2, 2017, a ten-count Superseding Indictment was filed in the Northern District of California charging Saleem Khan with violations of 18 U.S.C. § 1349 – Conspiracy to Commit Securities Fraud (Count One); 18 U.S.C. § 1348 Securities Fraud & Aiding and Abetting (Counts Two-Ten); and 18 U.S.C. § 1505 – Obstruction of Justice (Count Eleven); and a Forfeiture Allegation was included pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461.

3.  On January 31, 2019, the defendant pled guilty to Counts One through Ten of the Superseding Indictment.  Judgment and Sentencing are currently set for June 24, 2019 at 2:00 p.m., before the Honorable Haywood S. Gilliam Jr., United States District Judge.

4.  The written Plea Agreement, filed pursuant to Rules 11(c)(1)(A) and 11(c)(1)(B) of the Federal Rules of Criminal Procedure, is enclosed for the Court's review. According to the Plea Agreement, the defendant and the Government agreed to the following Sentencing Guidelines calculations:  Base Offense Level 7, pursuant to USSG §2B1.1; an 18-level increase, pursuant to USSG §2B1.1(b)(1)(J) for a gain of more than $3,500,000; a two-level decrease for Acceptance of Responsibility, pursuant to USSG §3E1.1, for a Total Offense Level 23. However, the government will argue for a two-level enhancement, pursuant to USSG §3C1.1 for Obstruction of Justice.  The undersigned officer is in agreement with the proposed guideline calculations as set forth in the Plea Agreement. There is no agreement for a recommended sentence, but the parties agreed the defendant will be subject to an expanded search condition as part of supervised release.

5.  On May 31, 2017, the defendant was arrested on a federal warrant. That same day he made an Initial Appearance before the Honorable Kandis A. Westmore, United States Magistrate Judge. The defendant was released on a $300,000 personal recognizance bond and under the supervision of U.S. pretrial supervision.  According to pretrial records, the defendant has been compliant and has not sustained any violations of his conditions of release.

### The Offense Conduct

6.  The following information was provided by the United States Attorney's Office, which included investigative reports prepared by the Federal Bureau of Investigation (FBI).

#### *Background*

7.  In late 2011 or early 2012, the government initiated an investigation into possible insider trading by Saleem Khan and others. During this investigation, the government discovered

evidence suggesting that Mr. Khan failed to disclose over $800,000 in income he had made from options trading when seeking to settle the outstanding balance on his home equity line of credit (CR 12-0860-YGR). On December 6, 2012, a grand jury returned an indictment charging Mr. Khan with Bank Fraud (18 U.S.C. § 344) and Making False Statements to a Financial Institution (18 U.S.C. § 1014).  On July 25, 2013, Mr. Khan pled guilty to both counts and on March 13, 2014, the court sentenced him to 21 months in prison and three years of supervised release.

8.     On June 13, 2014, the Securities and Exchange Commission ("SEC") filed a civil suit against Mr. Khan, alleging he engaged in insider trading of Ross Stores, Inc. options, and securities in Taleo Corporation.  The parties reached a settlement agreement in July 2016 and judgment was entered against Mr. Khan on September 21, 2016. Mr. Khan agreed to disgorge $7,493,000 in trading profits, along with a penalty in an equivalent amount plus interest, $846,147, for a total of $15,832,147. He did not admit to the allegations of insider trading. (CV 14-2743 HSG)

*Offense Conduct*

9.     Ross Stores, Inc. which does business as "Ross Dress for Less" and "dd's Discounts," is a discount clothing retailer now based in Dublin, California. The corporation was based in Pleasanton, California during the time period of the instant offense.  Ross Stores securities are traded on the NASDAQ Stock Market using the ticker symbol ROST.

10.    Saleem Khan and Roshanlal Chaganlal met in the late 1990s when they worked together at Brook Furniture Rental, and later they were both employed at Safeway. Mr. Chaganlal was employed at Ross as the director of shortage control for Ross's finance department. In December 2007, Mr. Chaganlal hired Mr. Khan as a contractor for Ross. In 2008, Mr. Khan left his contractor position at Ross Stores and began working at Kaiser Permanente as a finance manager.

11.    Ross Stores Inc. entrusted Mr. Chaganlal with access to confidential material, non-public material and sales figures that detailed Ross Stores' financial performance before it was publicly announced. Specifically, these figures were emailed to him weekly and he also received voice messages containing sales figures. According to Mr. Chaganlal, his main source of inside information regarding the company's performance came from Ross Stores' internal "flash" sales intranet page, which was available to him daily on the company's internal network accessed from his work computer. The "flash" page contained a monthly running total of sales and importantly compared the company's actual month-to-date sales to internal company forecasts regarding those sales figures.

12.    It was a violation of Ross Stores' policy, as well as a violation of a duty of trust and confidence that Mr. Chaganlal owed to Ross Stores, for him to provide material, nonpublic information to Mr. Khan knowing Mr. Khan intended to trade on it. The information obtained was not allowed to be used for personal gain.

13.    In summary, the scheme worked as follows: Inside information known to Mr. Chaganlal was passed to Mr. Khan. Mr. Khan then paid a premium to purchase stock options contracts

to buy or sell Ross stock (ticker symbol ROST) at a given price (commonly referred to as the "strike price") on or before a certain date (commonly referred to as the "expiration date" of the options contract). The expiration dates of the options contracts that Mr. Khan purchased were usually after the date when Ross was due to make its monthly earnings announcements. Mr. Khan based his decision on which options contracts with which strike prices to purchase based in part on the non-public information Mr. Chaganlal was giving him regarding Ross Stores' sales, and Mr. Khan considered the non-public information from Mr. Chaganlal in light of what was publicly known about the company's financial performance. Once Ross made its public earnings announcements and its share price went up or down based on that news, Mr. Khan would exercise his option to buy or sell Ross stock under the contracts that he had purchased or would let the options expire if the strike price was not "in the money" and the options were worthless.  Mr. Khan amassed more than $8 million in trading profits (although he suffered losses as well). An analysis of all of Mr. Khan's brokerage accounts, including the nominee account in his brother-in-law's name, showed an extraordinary disparity in the size and value of Mr. Khan's investments in Ross Store's options in comparison with other publicly-traded securities.

14.     Specifically, no later than in or about the summer of 2009, Mr. Chaganlal began regularly tipping Mr. Khan by providing Ross Stores sales and financial performance from the "flash" webpage and elsewhere. Thereafter, Mr. Khan and Mr. Chaganlal regularly met in person or would have telephonic conversations to discuss the information, which Mr. Khan later used to decide to purchase options contracts regarding Ross stock.

15.     Mr. Khan provided cash and other things of value to Mr. Chaganlal for his help during the scheme. Mr. Chaganlal received relatively little benefit from the scheme in comparison to Mr. Khan's profits.

16.     In 2009, Mr. Khan bet 43 times more money on ROST options than the next closest stock, which was TJ Maxx. The pattern continued in 2010, when he bet 73 times more on ROST options than TJ Maxx options, and in 2011, when he bet 56 times more on ROST options than TJ Maxx options. In 2012, Mr. Khan's bets on Ross stock were 43 times greater than those he place on TJ Maxx.

17.     In 2008, Mr. Khan opened an OptionsHouse account under his brother in-law's name, Shahid Khan. Mr. Khan provided Shahid with money to place into the account. In addition, Mr. Khan had Shahid record all profits in the account as income for federal and state income tax purposes. Mr. Khan later reimbursed Shahid for the excess tax obligation. Later in 2012, Mr. Khan admitted to FBI agents he had full control of the account. Specifically, the funds accrued in the OptionsHouse account were ultimately used in 2010 to purchase Mr. Khan's home, which was purchased for $1.25 million in cash. Mr. Khan did not list his name under the title of the house and instead listed his wife as 99% owner and 1% in Shahid's name.   Shahid later told investigators Mr. Khan asked him to open the account because he had bad credit and he was trying to hide money from creditors. Shahid said he agreed to help Mr. Kahn because he was older, and he was family.

18.     In July 2009, two $8,500 cashier checks were deposited into the Bank of America account for Sangita Chhagan (Roshanlal Chaganlal's wife), which were later transferred to the

OptionsHouse account in Shahid Khan's name. Later, Mr. Khan used the funds to trade in Ross Stores' options. Specifically, Mr. Chaganlal came across a Ross Stores' document prior to it being released to the public. Mr. Chaganlal disclosed the information to Mr. Khan, who later used the information to trade in Ross Stores' options. Mr. Chaganlal and Mr. Khan discussed the importance of the information that Mr. Chaganlal had come across, and that Chaganlal gave the $17,000 to Mr. Khan so Mr. Khan could trade on this information on Mr. Chaganlal's behalf.

19.    In early 2012, Mr. Chaganlal and Ms. Chhagan needed funds for the purchase of a new home in Dublin, California. (Their current home was in foreclosure.) Because Mr. Khan had been trading in Ross options on Mr. Chaganlal's behalf and had been keeping track of Chaganlal's earnings, Mr. Chaganlal asked Mr. Khan to provide him with some of those earnings. Toward this end, Mr. Khan enlisted the help of Ammar Akbari, who was a friend of Mr. Khan and a subordinate at Kaiser Permanente. Mr. Akbari understood Mr. Khan wanted to conceal the fact that Mr. Khan was providing money to Chaganlal. Mr. Khan told Mr. Akbari the reason for this was because Khan wished to purchase Chaganlal's existing home from him in a short sale, and they did not want the bank to see financial transactions between Khan and Chaganlal. On February 28, 2012, Mr. Akbari, Mr. Chaganlal, and Mr. Khan met at a Bank of America branch in Dublin. Mr. Khan gave Mr. Akbari a check for $35,000 drawn on Khan's Citibank account (check number 122). At or near the same time, Mr. Akbari gave Mr. Chaganlal two checks totaling $35,000, drawn on Mr. Akbari's Bank of America account and made out to Ms. Chhagan. Mr. Chaganlal deposited those checks into Ms. Chhagan's Bank of America account, and Mr. Akbari deposited the check from Khan into Akbari's Bank of America account. Records showed Mr. Chaganlal used these funds to make part of a down payment on the construction of his new home in Dublin and to pay taxes.

20.    In March 2012, Mr. Khan provided a $20,000 cashier's check to Mr. Akbari and Mr. Akbari made out a check for $20,000 to Ms. Chhagan. It does not appear that Mr. Akbari, Mr. Chaganlal, and Mr. Khan met for the deposit of those checks as they had done in February. Rather, Mr. Akbari's check to Ms. Chhagan was simply deposited into Ms. Chhagan's Chase account. Mr. Akbari previously suggested it was Mr. Khan who deposited the cashier's check from Khan into Akbari's Bank of America account.

21.    In August 2012, Mr. Khan provided $75,000 to Tommy Le, a mortgage broker, for a loan to Mr. Chaganlal. The money was used by Mr. Chaganlal as part of his home purchase. Earlier in 2012, Mr. Le set up an E-Trade account in which he allowed Mr. Khan to trade in ROST options and other securities. Le also helped provide Mr. Khan access to the Scottrade account of another individual – Michael Koza – so Mr. Khan could trade in ROST options and other securities in the account.

22.    Mr. Khan made several efforts to conceal his trading profits. As noted previously, a significant portion of the trading that occurred in this case was conducted in the nominee account at OptionsHouse, where Mr. Khan had his brother-in-law declare the profits as income for tax purposes. Later money from that account was used to purchase Khan's Dublin home for $1.25 million in cash.  Mr. Khan concealed his part in the transaction by putting the house in his wife's and his brother in law's names. Shahid Khan later gave his

1% interest in the house to his sister. After the government's investigation became public, Mr. Khan's marital settlement shows the house was classified as Khan's wife's "separate property," despite it being purchased with Mr. Khan's profits from trading. The division of assets appeared to put high-value unencumbered assets into his wife's name. Mr. Khan also sent at least $265,000 to Pakistan.

23. Ranjan Mendonsa was interviewed by the FBI.  He had known Mr. Khan for some time. He reported Khan provided him with trading tips regarding Ross Stores. When they began working together at Kaiser in 2009, Mr. Khan would often tell Mr. Mendonsa when he was going to trade in Ross shares, and when he felt the stock was going to move up or down. In 2010, he learned Mr. Khan was buying a new home for cash. This led him to believe Mr. Khan knew what he was doing with Ross. He knew Khan and Chaganlal were friends, but never asked if Khan was receiving information from Chaganlal. In September 2011, Mendonsa lost his job at Kaiser.  He went to Mr. Khan and expressed his concern. He reported to agents Khan essentially told him, "If you trade in Ross like I do, you will be able to pay off your mortgage." Mr. Khan also admitted to him he had invested $17,000 on Chaganlal's behalf and was funneling profits back to Chaganlal.

24. Investigators later learned Mr. Chaganlal was in financial trouble and was motivated to disclose inside information to Mr. Khan. Mr. Chaganlal and his wife declared bankruptcy in 1998 and 2008. Despite having a $200,000 yearly salary at Ross, Mr. Chaganlal was unable to pay his non-secured debts.  After the bankruptcy, they were left with a large mortgage on their home. In 2005, the Chaganlals' refinanced their home and took away $250,000 in cash. This money was to be used by Ms. Chhagan to open a Dollar Store franchise. However, Mr. Chaganlal lost the entire $200,000 while gambling in Las Vegas.

## Victim Impact

25. A victim impact statement was received from a law firm representing Ross Stores, Inc. Ross is requesting restitution in the amount of $649,203 related to attorney fees and expenses during the company's participation in the government investigations and prosecutions of Mr. Khan and Mr. Chaganlal. The victim impact statement and loss calculations will be provided to the court under separate cover.

26. In the statement, Ross explained how the company was affected in many ways. For example, the statement noted, "Ross worked hard to develop and maintain a work environment where its employees operate in an atmosphere of trust in cooperation. The conduct of co-conspirators Chaganlal and Khan put that atmosphere at risk as the company's employees learned of Mr. Chaganlal's breach of trust. Ross cannot quantify the impact of the damage to the working relationships amongst its employees caused by the crimes of the co-conspirators."

## Adjustment for Obstruction of Justice

27. The defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice for the following reasons: Once the investigation by the FBI and the SEC began, the defendant counseled Mr. Chaganlal and Mr. Akbari to create loan

agreements to falsely document the February and March 2012 movement of money between Mr. Khan and Mr. Chaganlal.  After Mr. Khan was interviewed by the FBI and Mr. Chaganlal was interviewed by the SEC in October and November 2012, Mr. Khan suggested to Mr. Chaganlal that he repay the "loans" he received from Mr. Akbari to make them appear legitimate. However, Mr. Chaganlal did not have the funds.  To accomplish this, in early 2013 Mr. Khan provided $20,000 in cash to Mr. Chaganlal's sister-in-law who was instructed to wire the money from Australia to her sister. The purpose of this transaction was for Mr. Chaganlal to make an attempt to pay off one of the "loans" from Akbari. Indeed, bank records obtained by the government show that Chhagan received a wire transfer from her sister on February 19, 2013, and she used these and other funds to write a $22,000 check on February 21, 2013, to Akbari as an ostensible repayment for one of the "loans" that Akbari had provided to Chaganlal/Chhagan in February 2012. Mr. Akbari told the government he later provided these funds to his attorney at the time, who then provided the funds to Mr. Khan's defense counsel.

28.     Additionally, the SEC issued subpoenas to Khan, Chaganlal, Akbari and others in February 2013. One of the requests was for all documents relating to the transfer of funds between them, and another was for all bank account documents. Although Mr. Khan provided hundreds of documents in response to the subpoena, he failed to provide a copy of the $35,000 check (#122) he wrote to Akbari on February 28, 2012 or the Citibank check dated March 22, 2012, that was provided to Akbari in March 2012. The government provided evidence that check #122 was in fact provided to Mr. Khan by Citibank when he was gathering documents to respond to the subpoena. However, that check, and others, were not provided to the SEC.  On May 13, 2019, the case agent interviewed a litigation support technician from Citibank who confirmed check #122 was provided to the defendant.

### Adjustment for Acceptance of Responsibility

29.     The defendant was interviewed by the probation officer and provided a statement wherein the defendant admitted involvement in the offense. The defendant stated "I'm sorry all that happened. It's been devastating to myself, my family, and my children."

### Offense Level Computation

30.     In accordance with the Supreme Court Decision in **United States v. Booker**, the following guideline calculations are no longer binding but advisory. Therefore, they must be considered by the sentencing court together with other sentencing goals. The current United States Sentencing Commission, 2018 Guidelines Manual, is being used as there are no ex post facto issues. USSG §1B1.11(a).

31.     Pursuant to 18 U.S.C. §3D1.2, all counts involving substantially the same harm shall be grouped together into a single group.  Specifically, in this case the counts group under subsection (d) when the offense level is determined largely on the basis of the total amount of harm or loss.

Re:  Khan, Saleem (41918)                                                                           Page 10

**Count Group 1**: **Conspiracy to Commit Securities Fraud and Securities Fraud**

32.     **Base Offense Level:** The guideline for a violation of 18 U.S.C. § 1348 is USSG §2B1.1. The base offense level is 7. USSG §2B1.1(a)(1).                                **7**

33.     **Specific Offense Characteristics:** Pursuant to USSG §2B1.1(b)(1)(J), because the gain was greater than $3,500,000, but less than $9,500,000, an 18-level increase is warranted. The gain in this case was approximately $8.2 million.                   **+18**

34.     **Victim Related Adjustment:** None.                                                          **0**

35.     **Adjustment for Role in the Offense:** None.                                                 **0**

36.     **Adjustment for Obstruction of Justice:** The defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and the obstructive conduct related to the defendant's offense of conviction and any relevant conduct; or a closely related offense; therefore, two levels are added. USSG §3C1.1.                                                          **+2**

37.     **Adjusted Offense Level (Subtotal):**                                                       **27**

38.     **Chapter Four Enhancement:** None.                                                           **0**

39.     **Acceptance of Responsibility:** The defendant has clearly demonstrated acceptance of responsibility for the offense. Accordingly, the offense level is decreased by two levels. USSG §3E1.1(a).                                                              **-2**

40.     **Total Offense Level:**                                                                     **25**

## PART B. THE DEFENDANT'S CRIMINAL HISTORY

41.     Pursuant to United States v. Booker, 125 S.Ct. 738 (2005), the Court should consider the following criminal history category calculation to be advisory.

        **Juvenile Adjudication(s)**

42.     None.

Re: Khan, Saleem (41918)                                                                  Page 11

### Adult Criminal Conviction(s)

| | Date of Arrest | Conviction/Court | Date Sentence Imposed/Disposition | Guideline | Pts |
|---|---|---|---|---|---|
| 43. | 12/14/2012 (Age 48) | 18 U.S.C. § 1344 - Bank Fraud, felony; 18 U.S.C. § 1014 - False Statements to a Financial Institution, felony/ U.S. District Court, Northern District of CA, Oakland, CA; Docket No.: 0971 4:12CR00860-001 | 03/13/2014: 21 months custody, 36 months supervised release, fine, restitution 02/04/2016: Supervised release began 02/03/2019: Supervised release terminated | 4A1.1(a)[1] | 3 |

The defendant was represented by counsel. According to an FBI investigation, in 2001, Saleem M. Khan purchased a residence at 370 Appian Way in Union City, located in Alameda County, California ("the Appian Way residence").  Mr. Khan resided at the Appian Way residence until approximately January 2011, when he moved to Dublin, California.

On September 2, 2005, Mr. Khan obtained a home equity line of credit from E-Loan regarding the Appian Way residence in the amount of $345,000 ("HELOC" or "HELOC loan").  On October 3, 2005, a deed of trust securing the HELOC was filed with the Alameda County Recorder's Office with respect to the Appian Way residence.

On October 25, 2005, E-Loan sold the HELOC loan to E-Trade.  Thereafter, E-Trade utilized PNC Bank to service the HELOC loan.  As of January 2010, Mr. Khan's outstanding principal balance on the HELOC was approximately $344,850.  In March 2011, PNC reconveyed the deed of trust securing the HELOC to Khan and his wife, thereby removing the lien on Khan's Appian Way residence.

Beginning no later than July 2010, and continuing to approximately March 2011, Khan knowingly devised and executed a scheme to defraud PNC and E-Trade in order to obtain more than $299,850 in funds owed on the HELOC secured by the Appian Way residence and the deed of trust securing the HELOC, by means of materially false and fraudulent pretenses, representations, and promises, and by concealment of material facts. Mr. Khan devised and participated in a scheme to defraud PNC and E-Trade by providing PNC with

---

[1] After careful review of the instant offense and the defendant's prior federal case, and consultation with the government, the probation office determined that this offense should be assessed criminal history points, pursuant to USSG §4A1.1(a). Pursuant to USSG §4A1.2, comment. (n.1), a sentence is a prior sentence if it is for conduct *other* than conduct that is part of the instant offense. Although the bank fraud conduct occurred during the same period that Mr. Khan was committing securities fraud, the prior charges relate to different criminal conduct than in the instant case (i.e., in the prior case, Mr. Khan defrauded PNC Bank and E-Trade Bank to obtain forgiveness of a $300,000 home equity line of credit). Thus, the prior federal sentence is not part of relevant conduct for the instant offense.

material false and fraudulent information for the purpose of fraudulently inducing PNC and E-Trade to settle his outstanding balance on the HELOC for substantially less than what was owed, and to reconvey to himself the deed of trust securing the HELOC.

In furtherance of the scheme, after about January 2010, Khan stopped making payments on the HELOC loan.  On July 13, 2010, Mr. Khan falsely stated in a telephone call with a PNC representative the reason he had defaulted on payments on the HELOC loan was that he had been laid off from his job for 14 months.  On October 29, 2010, the HELOC loan was charged off by PNC, with E-Trade's concurrence, and referred to PNC's recovery department, which operated as a division of PNC known as CLC Consumer Services. Thereafter, Mr. Khan told a default specialist in PNC's recovery department he was in financial hardship and wanted to settle the loan.  On January 13, 2011, in response to a request from the PNC default specialist, Mr. Khan sent an e-mail to the default specialist in Pennsylvania, which included attached documents supporting his offer to settle the HELOC for $45,000.  These documents included (a) a so-called hardship letter in which Mr. Khan falsely stated that he had lost his job at the end of 2007 and was not able to secure a stable job until July 2010; (b) altered pay statements falsely indicating Mr. Khan was employed by AB Star Group, from which he purportedly received a bi-weekly net salary of approximately $1,900; and (c) an income and expense statement falsely listing a monthly income of $4,117.  Mr. Khan involved his nephew, Kamran Khan, in altering the latter's pay statements to make it appear Khan was employed by AB Star Group.

In truth, at the time of his January 13, 2011 e-mail, Mr. Khan had been nearly continuously employed since July 1995.  Further, in December 2008, Mr. Khan began working as a consultant for Kaiser Permanente.  On July 29, 2009, Khan was hired as a full-time employee of Kaiser Permanente, with a bi-weekly net salary of approximately $3,190 in January 2011.  At no time was Khan ever an employee of AB Star Group.  Moreover, between April 2010 and January 2011, Mr. Khan earned more than $870,000 by buying and selling options and by conducting other transactions through brokerage accounts, which income was not disclosed in the income and expense sheet that Mr. Khan submitted to PNC on January 13, 2011.

The information provided by Khan to PNC on July 13, 2010; January 13, 2011; and on other occasions was material to PNC's and E-Trade's decisions as to whether to (a) agree to settle the HELOC loan for the amount proposed by Khan (i.e., $45,000), (b) make a counter-offer to settle the HELOC loan for a greater amount, or (c) not settle the HELOC loan at all.  On January 25, 2011, based on the information provided by Khan, PNC, with E-Trade's approval, agreed to settle the HELOC loan for $45,000.  On February 14, 2011, Mr. Khan caused a cashier's check in the amount of $45,000 to be sent to CLC Consumer Services.  Upon receipt of that check, Mr. Khan was released from his obligation to pay the remaining balance on the HELOC loan.  Through his actions, Mr. Khan induced PNC to reconvey the deed of trust securing the HELOC to Mr. Khan and his wife in March 2011. By virtue of this reconveyance, the lien on Khan's Appian Way residence was removed.

FBI agents interviewed Mr. Khan in October 2012.  He told the agents he remembered submitting the hardship packet described above to PNC Bank.  When asked about the pay stub from AB Star Group he submitted to PNC Bank, Mr. Khan admitted the document

was fraudulent and he was working for Kaiser, not AB Star Group, at the time.  Mr. Khan told the agents he used the AB Star Group pay stubs because he believed the bank holding the HELOC would not negotiate with him if it knew his true income from Kaiser.  Mr. Khan admitted he received the altered AB Star Group pay stubs from his nephew, who was employed at AB Star Group.  Khan told the agents the reason he submitted the false information and documents to PNC Bank was because he was "under water" on the Appian Way residence and he wanted to get out from under the HELOC.  Although Mr. Khan initially told the agents the $45,000 he used to settle the HELOC was provided by his brother-in-law, he later admitted that the money was actually his.

The defendant performed well on supervised release.  He paid his monetary penalties in full and maintained employment.  There were no violations of his supervised release conditions.

### Criminal History Computation

44.    The total criminal history score is three. According to the sentencing table in USSG Chapter 5, Part A, a criminal history score of three establishes a criminal history category of II.

### Other Criminal Conduct

45.    None.

### Pending Charges

46.    None.

### Other Arrests

47.    None.

## PART C. OFFENDER CHARACTERISTICS

48.    The following information was provided by the defendant during the presentence investigation interview. A voice mail message was left with his wife; to date, the call has not been returned.  A home visit was conducted on May 8, 2019.

### Personal and Family Data

49.    Saleem M. Khan was born on May 2, 1964, in Tanda, Pakistan, to Ayub Khan (deceased) and Bib Zaitoon Khan (age 89), currently residing in Pakistan. The defendant advised of eight siblings (all residing in Pakistan): Shokat Ali Khan (half-brother, age 69), Bibi Mukhtiar (half-sister, age 66), Shamim Qamar (half-sister, age 61), Naseem Ayaz (age 57), Mohammad Naeem Khan (age 54), Farhat Niaz (half-sister, age 53), Mohammad Fahim Khan (age 50), and Mohammad Wasim Khan (age 48).

50.     The defendant was raised and lived in Pakistan until he immigrated to Texas at age 26 for graduate school.  According to immigration records, the defendant became a U.S. citizen in 1996.  Since approximately 1994, he has resided in or near the San Francisco Bay Area.  Mr. Khan shared that his father was killed in a car accident when he was six years old.  The defendant indicated he didn't fully understand his father had passed away until several months later, when he began to miss his father greatly.  Mr. Khan has reflected upon the lack of his father's presence during significant events throughout his life (his college graduation, his marriage, etc.).  He provided his mother did her best to raise him, and his oldest half-brother, and his uncles acted as father figures toward him during his youth.  Though he received basic necessities, Mr. Khan indicated he often wore second-hand clothing and resources were somewhat scarce.

51.     During his youth, the defendant enjoyed playing cricket, participating in study groups, and helping to tutor other neighborhood children.  The defendant shared he is involved with a Muslim Community Center in Pleasanton, California; the San Ramon Valley Islamic Community; and the Islamic Community of the East Bay in Fremont, California.

52.     In 1992, the defendant married Ghazala Khan.  The couple has three children: Faraz (age 22), Omair (age 18), and Semra (age 16), all of whom reside in the family home.  Ms. Khan is currently working as a psychotherapist.  The defendant's wife filed for divorce in 2014, when the defendant was incarcerated for the prior federal offense. They continue to live together but reside in separate areas of the home.  Mr. Khan is unsure what will happen in the future, but he anticipates his wife will ultimately divorce him.

53.     A home visit was conducted on May 8, 2019, at 5896 Annandale Way in Dublin, California. The 4,900 square foot, two-story home is in a gated community.  The defendant was home with his son, who was sleeping.  The home was clean and nicely decorated. The home has five bedrooms, and an office/game room.

**Physical Condition**

54.     The defendant is 55-year-old male born in Pakistan.  He stands 5'11" tall, weighs 195 pounds, and has brown eyes and black hair.  The defendant displayed a scar on his right elbow, the result of a childhood injury.  Mr. Khan has no tattoos.  He suffers from Type II diabetes and high blood pressure.  Mr. Khan provided verification of the following medications: Metformin (550mg for diabetes), Glipizide (10mg for diabetes), Pioglitiazone (45mg for diabetes), and Lisinopril (5mg for blood pressure).

**Mental and Emotional Health**

55.     The defendant shared he has experienced depression since the onset of the prior federal case.  The defendant was released from federal custody in 2016 and the new federal Indictment was filed in 2017.  Mr. Khan is currently prescribed Paroxitine (150mg) to treat his depression (verification not received).  The defendant feels seeing a counselor may be helpful to him in addressing his stress about the criminal case and the dissolution of his marriage.  The defendant's attorney advised during the pendency of this case, the defendant

has been unwilling or unable to assist with his defense. The defendant has been withdrawn, depressed and forgetful.

### Substance Abuse

56.   During the previous presentence investigation, the defendant advised of no history of drug or alcohol use or abuse. However, during the interview for the instant case, the defendant admitted to drinking heavily and using marijuana with friends.  He advised no alcohol is kept in his house, so he drinks with friends at bars.  When asked who these friends were, the defendant said, "Losers like me." The defendant admitted to drinking heavily and gambling with co-conspirators during the instant offense.  When asked about counseling, the defendant advised he believes once the criminal case is over he will be able to get back to a normal and sober life.

### Educational, Vocational and Special Skills

57.   The defendant reported obtaining bachelor's and master's degrees in Pakistan.  He received a master's degree (MBA) in corporate finance from the University of Dallas in Irving, Texas in 1992.  The defendant provided a copy of his MBA as verification.  Mr. Khan speaks English, Urdo, and Pushto.  The defendant advised of formerly holding Series 7 and 63 licenses (investment-related) in Texas in 1994, though they expired in 1997.

### Employment Record

58.   The defendant has been employed with Fastrack Airport Parking from October 2015 to the present.  He is employed as an office manager. He works five to six-hour days and earns approximately $3,000 per month. This employment has been verified during his prior probation supervision and his current pretrial supervision.

59.   From December 2008 to February 2012, the defendant was employed as a finance manager with Kaiser Permanente in Pleasanton, California, where he earned a salary of $155,000 per year.  This position was verified and referenced during the investigation of the instant offense.

60.   From April to October of 2008, the defendant was employed as a contracted financial consultant with Cisco Systems in San Jose, California, and earned $80 per hour.

61.   From December 2007 to April 2008, the defendant worked as a contractor and consultant with Ross Stores in Pleasanton, where he earned $90 per hour (verified though discovery materials).

62.   From February 2002 to October 2007, the defendant was employed as the director of finance with Safeway, Inc. in Pleasanton.  He earned a salary of $130,000 per year.

### Financial Condition: Ability to Pay

63.   The defendant was provided with a Probation Form 48 and asked to return it as soon as possible. The form was not returned.  The defendant advised he was assessed a $60,000

fine and $313,000 in restitution in the prior federal case.  These financial penalties and the separation from his wife depleted his savings and assets.  His only asset is a retirement fund; however, the government indicated the defendant loaned an individual named, Tabish Anwar, a large amount of money. As of early 2019, this loan had not been repaid. Additionally, in his marital settlement, he listed ownership in SGK Real Estate Holdings, which was valued at $350,000.  His wife owns the home they share and pays the household bills.

64.    A credit report revealed only two open charge accounts with balances totaling $4,000.

### Analysis

65.    Considering the prior monetary penalties in the prior federal case, the likelihood of a restitution order and the defendant's minimal known assets, it appears he would have difficulty paying a fine.

## PART D. SENTENCING OPTIONS

66.    Pursuant to United States v. Booker, 125 S.Ct. 738 (2005), the Court should consider the following guideline provisions to be advisory.

### Custody

67.    **Statutory Provisions:** The maximum term of imprisonment on Counts 1-10 is 25 years. 18 U.S.C. § 1349. This offense is a Class B felony. 18 U.S.C. § 3559(a)(2).

68.    **Guideline Provisions:** Based upon a total offense level of 25 and a criminal history category of II, the guideline imprisonment range is 63 months to 78 months. Because the guideline range falls into Zone D of the Sentencing Table, the minimum term must be satisfied by a sentence of imprisonment. USSG §5C1.1(f).

### Supervised Release

69.    **Statutory Provisions:** The Court may impose a term of supervised release of not more than five years on Counts 1-10. 18 U.S.C. § 3583(b)(1). The court shall order, as an explicit condition of supervised release, that the defendant not commit another Federal, State or local crime during the term of supervision and that the defendant not unlawfully possess a controlled substance. The court shall also order, as an explicit condition of supervised release, that the defendant refrain from any unlawful use of a controlled substance and submit to a drug test within 15 days of release to supervision and 2 periodic drug tests thereafter for use of a controlled substance, pursuant to United States v. Antonio D. Stephens, 424 F. 3d 876 (9th Cir. 2005). The court shall order as an explicit condition of supervised release, that the defendant cooperate in the collection of a DNA sample from the defendant, if the collection of such sample is authorized pursuant to the revised DNA collection requirements under the Justice for All Act of 2004. The court may further order any other condition it deems appropriate. 18 U.S.C. § 3583(d).

70.    Multiple terms of supervised release shall run concurrently. 18 U.S.C. § 3624(e).

71.   **Guideline Provisions:** Since the offenses for Counts 1-10 are Class B Felonies, the guideline range for a term of supervised release is 2 years to 5 years. USSG §5D1.2(a)(1). The court shall order, as an explicit condition of supervised release, that the defendant not commit another Federal, State or local crime during the term of supervision and that the defendant not unlawfully possess a controlled substance. The court shall also order, as an explicit condition of supervised release, that the defendant refrain from any unlawful use of a controlled substance and submit to a drug test within 15 days of release to supervision and 2 periodic drug tests thereafter for use of a controlled substance, pursuant to United States v. Antonio D. Stephens, 424 F. 3d 876 (9th Cir. 2005). The court shall order as an explicit condition of supervised release, that the defendant cooperate in the collection of a DNA sample from the defendant, if the collection of such sample is authorized pursuant to the revised DNA collection requirements under the Justice for All Act of 2004. The court may further order any other condition it deems appropriate. 18 U.S.C. § 3583(d).

**Probation**

72.   **Statutory Provisions:** Counts 1-10: The defendant is ineligible for probation because the offenses are Class B Felonies. 18 U.S.C. § 3561(a)(1).

73.   **Guideline Provisions:** Counts 1-10: The defendant is ineligible for probation because the offense is a Class B Felony. USSG §5B1.1(b)(1).

**Fines**

74.   **Statutory Provisions:** Counts 1-10: The maximum fine is $250,000. 18 U.S.C. § 3571(b).

75.   Counts 1-10: A special assessment of $100 is mandatory. 18 U.S.C. § 3013.

76.   **Guideline Provisions:** The fine range for this offense is from $10,000 to $100,000. USSG §§5E1.2(c)(3) and (h)(1).

77.   Costs of prosecution shall be imposed on the defendant as required by statute. USSG 5E1.5. In determining whether to impose a fine and the amount of such fine, the Court shall consider, among other factors, the expected costs to the government of any term of probation, or term of imprisonment and term of supervised release imposed. USSG 5E1.2(d)(7) and 18 U.S.C. 3572(a)(6). These costs may include drug and alcohol treatment, electronic monitoring, and/or contract confinement costs. The most recent advisory from the Administrative Office of the United States Courts, dated August 1, 2018, provides the following monthly cost data:

|           | Bureau of Prisons Facilities | Community Correction Centers | Supervision by Probation Officer |
|-----------|------------------------------|------------------------------|----------------------------------|
| Daily     | $99.00                       | $89.00                       | $12.00                           |
| Monthly   | $3,025.00                    | $2,692.00                    | $364.00                          |
| Annually  | $36,300.00                   | $32,309.00                   | $4,369.00                        |

**Restitution**

78.    **Statutory Provisions:** Pursuant to 18 U.S.C. § 3663A, restitution in the amount of $649,203 be ordered in this case. Restitution, as set forth below, is due and owing to the following victims: Ross Stores, Inc., Attn: Ken Jew, Group Senior Vice President, General Counsel & Corporate Secretary, CR17-00385 Restitution, 5130 Hacienda Drive, Dublin, CA 94568 (925-965-4848).

79.    **Guideline Provisions:** In the case of an identifiable victim, the Court shall enter a restitution order for the full amount of the victim's loss, if such order is authorized under 18 U.S.C. § 1593, § 2248, §2259, § 2264, §2327, § 3663, or § 3663A, or 21 U.S.C. § 853(q). USSG §5E1.1(a)(1).

**Forfeiture**

80.    **Statutory Provisions:** Forfeiture shall be pursuant to 18 U.S.C. §§ 981(a)(1)(C), 982(a) and 21 U.S.C. § 2461.

81.    **Guideline Provisions:** Forfeiture is to be imposed upon a convicted defendant as provided by statute. USSG § 5E1.4.

**Denial of Federal Benefits**

82.    **Statutory Provisions:** None.

83.    **Guideline Provisions:** None.

## PART E. FACTORS THAT MAY WARRANT DEPARTURE

84.    The probation officer has not identified any factors that would warrant a departure from the applicable sentencing guideline range.

## PART F. FACTORS THAT MAY WARRANT A SENTENCE OUTSIDE OF THE ADVISORY GUIDELINE SYSTEM

85.   Presentation of information in this section does not necessarily constitute a recommendation by the probation officer for a sentence outside the applicable advisory guideline range.

86.   Pursuant to 18 U.S.C. § 3553(a), the Court may consider the nature and circumstances of the offense as well as the history and characteristics of the defendant. The Court can consider that the investigation for both the instant offense and the prior federal case happened at the same time.  Although the investigation into the defendant's insider trading yielded evidence of two very different crimes, they were prosecuted separately. The length of the process, which included two Indictments, two Change of Plea hearings and two sentencings, is very unusual and it has caused a significant amount of stress for the defendant.

Respectfully Submitted,

Anthony Castellano
Chief U.S. Probation Officer

By: Jessica A. Goldsberry
       U.S. Probation Officer Specialist

Approved:

Joan  Vazquez-Santiago
Supervisory U.S. Probation Officer

**ADDENDUM TO THE PRESENTENCE REPORT**

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
UNITED STATES V. SALEEM MOHAMMAD KHAN, DKT. 0971 4:17CR00295-001
HSG**

The United States Probation Officer certifies that the presentence investigation report, including any revisions thereof and this addendum, has been disclosed to the defendant's counsel for discussion with the defendant, and to counsel for the Government, pursuant to Crim. L.R. 32-5 and FRCrimP 32(g).

## OBJECTIONS

### By the Government

1. A written response has been received from the Government, which is in compliance with Crim. L.R. 32-4(b) and (c).

2. **Objection Number One:**  Government counsel objects to the information from defense counsel in the mental health section of the report, noting the defendant has been unwilling or unable to help with his defense, and has been depressed and forgetful.  Counsel noted if such information about the defendant's emotional and mental health is included in the report, then it should be from a medical practitioner.

3. **Probation Officer's Response:**  The probation officer respectfully disagrees.  Although the probation officer attempts to verify all mental health conditions with medical records, it is also appropriate to include impressions of a defendant's mental or physical well-being by family and others close to the defendant. This information was not included to suggest the defendant did not understand the proceedings or was incompetent in any way.

### By the Defendant

4. A written response has been received from the defense counsel, which is in compliance with Crim. L.R. 32-4(b) and (c).

5. **Objection Number One:**  Counsel objects to the report's lack of a downward departure consideration, pursuant to USSG §§5G1.3(d), and 5K2.23. Counsel asserts the following, "The Guidelines, Judge Gilliam, the prosecution and the actual plea agreement in this case all recognize that a downward departure pursuant to  USSG §§5G1.3(d), and 5K2.23 may be applicable." Along those lines, counsel objects to the inclusion of criminal history points for the prior federal offense because the conduct stemmed from the same investigation.

6. **Probation Officer's Response:** USSG §5G1.3(d) is not applicable in this case as that section refers specifically to an imposition of a sentence on a defendant subject to an undischarged term of imprisonment or anticipated state term of imprisonment. That is not the case here.  The defendant's prior term of imprisonment has already been discharged.

Re:  Khan, Saleem (41918)

7. As far USSG §5K2.23 is concerned, a departure for this section would be warranted only if the Court finds the conduct in the previous case is relevant conduct to the instant offense. The probation officer acknowledges the conduct overlapped and the investigation began with the insider trading conduct. Nevertheless, the conduct is completely different. As such, the officer found a departure was not warranted, and the prior federal sentence counts for criminal history points, pursuant to USSG §4A1.1(a).

8. **Objection Number Two**:  Counsel objects to the inclusion of an enhancement for Obstruction of Justice, pursuant to USSG §3C1.1 for the following reasons: 1) the conduct was not admitted in the plea agreement; 2) the loan was legitimate; 3) Akbari and Chaganlal had independent reasons to document the loan; 4) Khan did not participate in creating the notes documenting the loan; and 5) if the loans were "window dressing" there would be no reason to collateralize them. Counsel asserts Mr. Khan did not conceal check no. 122, as he knew the check would be provided by Mr. Akbari, and he provided a bank statement documenting the check.

9. **Probation Officer's Response**: The probation officer believes the enhancement remains applicable for the following reasons. Of note, facts presented in the presentence report are not limited to only facts agreed to in the plea agreement.  Furthermore, Mr. Khan was providing benefits to Chaganlal and he needed to conceal those benefits. He did this by suggesting to Akbari and Chaganlal that the loan agreements be drafted, a year after the "loans" were made. Both Mr. Chaganlal and Mr. Akbari told FBI agents that Mr. Khan suggested their transactions should be formalized after the FBI and SEC began an investigation. According to the government, Citibank's position is that Mr. Khan was provided with check number 122 in response to his request.

10. **Objection Number Three**:  Counsel objects to the report's failure to include a reason for a variance that was included in the 2014 presentence report. Specifically, the 2014 report noted a variance could be considered as the defendant was the sole provider for his wife and three children.

Re:  Khan, Saleem (41918)

11. **Probation Officer's Response:** Although this may have been an appropriate factor to consider at the prior sentencing, the facts are no longer the same.  The house wherein his wife and children reside belongs only to the wife. The defendant reported his wife is employed as psychotherapist, and two of their children are now adults. The defendant provided no evidence that that he was the sole financial support for his family.


Respectfully Submitted,

Anthony Castellano
Chief U.S. Probation Officer


By: Jessica A. Goldsberry
        U.S. Probation Officer Specialist


Approved:


Joan  Vazquez-Santiago
Supervisory U.S. Probation Officer

**SENTENCING RECOMMENDATION**

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**
**UNITED STATES V. SALEEM MOHAMMAD KHAN, DKT. 4:17CR00295-1 HSG**

**TOTAL OFFENSE LEVEL**              25
**CRIMINAL HISTORY CATEGORY**        II

|  | **Statutory Provisions** | **Guideline Provisions** | **Recommended Sentence** |
|---|---|---|---|
| **CUSTODY:** | Ct. 1: Not more than 25 years<br>Ct. 2-10: Not more than 5 years | 63 months-78 months | 24 months (variance) |
| **SUPERVISED RELEASE:** | Ct. 1: Not more than 5 years<br>Ct. 2-10: Not more than 5 years | Ct. 1: 2 years-5 years<br>Ct. 2-10: 2 years-5 years | 2 years |
| **PROBATION:** | Ineligible | Ineligible | Not Recommended |
| **FINE:** | Ct. 1: $250,000<br>Ct. 2-10: $250,000 | $10,000-$100,000 | Waived |
| **RESTITUTION:** | $649,203 | $649,203 | $649,203 |
| **SPECIAL ASSESSMENT:** | All Counts: $100 per count | All Counts: $100 per count | $1,000 |

**Justification:**

Saleem Khan, age 55, appears before the Court after pleading guilty to 10 counts of Securities Fraud and Conspiracy. In late 2011 or early 2012, the government initiated an investigation into possible insider trading by Saleem Khan and others. During this investigation, the government discovered evidence suggesting that Mr. Khan failed to disclose over $800,000 in income he had made from options trading when seeking to settle the outstanding balance on his home equity line of credit (CR 12-0860-YGR).  On July 25, 2013, Mr. Khan pled guilty to Bank Fraud and False Statements and on March 13, 2014, the court sentenced him to 21 months in prison and three years of supervised release. The defendant did not admit to insider trading.  The investigation further

Re:  Khan, Saleem (41918)                                                                          Page 2

discovered that in 2009, the defendant's friend and former co-worker, Roshanlal Chaganlal, began regularly tipping Mr. Khan by providing privileged Ross Stores sales and financial performance information. Mr. Khan and Mr. Chaganlal regularly met in person or would have telephonic conversations to discuss the information, which Mr. Khan later used to decide to purchase options contracts regarding Ross stock. Mr. Khan provided cash and other things of value to Mr. Chaganlal for his help during the scheme.

The defendant's only prior conviction is the prior federal offense for bank fraud.  He received a sentence of 21 months custody, and three years supervised release.

The defendant was born in Pakistan and lived there until he immigrated to the United States at age 26 for graduate school. The defendant described a stable childhood, but he struggled with the loss of his father when he was just six years old. The defendant married in 1992 and had three children with his wife. The defendant's wife filed for divorce, but they remain living together.  He has been gainfully employed for many years and he has an MBA degree. The defendant has struggled emotionally during the pendency of this case and is taking medication for depression. He also admitted to recently drinking heavily and using marijuana with friends. The defendant performed well on both supervised release in the prior federal case, and again while on pretrial supervision for this case. The circumstances in this case warrant a significant variance from the guideline range.  It is unusual to have two criminal cases for one person brought from one investigation. It is understandable that investigations take time and because the conduct was very different in each of the indictments, the bank fraud case was prosecuted and disposed of first. It is probable that the defendant would have received a higher sentence at his 2014 federal sentencing had he also admitted to insider trading conduct; yet, it is impossible to know what that sentence would be. The defendant has been under indictment and on some type of community supervision for many years and it is likely that he is at a greatly reduced risk for similar conduct.

As such, a sentence of 24 months custody is recommended to be followed by two years supervised release. The defendant agreed to an expanded search condition as part of supervised release. Considering the defendant's recent alcohol and substance abuse, substance abuse testing and treatment are recommended. Financial conditions are recommended to ensure he is paying what he can towards restitution. He must also comply with DNA collection.  It light of the restitution, a fine is not recommended.  He is required to pay a $1,000 special assessment.  Ross Stores is requesting restitution in the amount of $649,203.

## Voluntary Surrender:

It appears the defendant is a person whose release is not restricted under 18 U.S.C. §3143. The defendant has kept all court appearances, complied with conditions of pretrial release, and is not viewed as a flight risk or a danger to the community.  Therefore, the defendant is considered to be a good candidate for voluntary surrender.

## Recommendation

It is respectfully recommended that sentence in this case be imposed as follows:

Re:  Khan, Saleem (41918)                                                                                 Page 3

Pursuant to the Sentencing Reform Act of 1984, it is the judgment of the Court that Saleem Khan is hereby committed to the custody of the Bureau of Prisons to be imprisoned for a term of 24 months. This term consists of terms of 24 months on Counts One through Ten, all counts to be served concurrently.

Upon release from imprisonment, the defendant shall be placed on supervised release for a term of two years. This term consists of terms of two years on each of Counts One through Ten, all such terms to run concurrently. Within 72 hours of release from the custody of the Bureau of Prisons, the defendant shall report in person to the probation office in the district to which the defendant is released.

While on supervised release, the defendant shall not commit another Federal, State or local crime, shall comply with the standard conditions that have been adopted by this court, shall refrain from any unlawful use of a controlled substance and submit to a drug test within 15 days of release on supervised release and 2 periodic drug tests thereafter, and shall comply with the following conditions:

**<u>Recommendation</u>**

1.    You must pay any restitution and special assessment that is imposed by this judgment and that remains unpaid at the commencement of the term of supervised release.

2.    You must cooperate in the collection of DNA as directed by the probation officer.

3.    You must submit your person, residence, office, vehicle, electronic devices and their data (including cell phones, computers, and electronic storage media), or any property under your control to a search. Such a search shall be conducted by a United States Probation Officer or any federal, state or local law enforcement officer at any time with or without suspicion. Failure to submit to such a search may be grounds for revocation; you must warn any residents that the premises may be subject to searches.

4.    You must participate in a program of testing and treatment for drug abuse, as directed by the probation officer, until such time as you are released from treatment by the probation officer. You are to pay part or all of the cost of this treatment, at an amount not to exceed the cost of treatment, as deemed appropriate by the probation officer. Payments shall never exceed the total cost of urinalysis and counseling. The actual co-payment schedule shall be determined by the probation officer.

5.    You must provide the probation officer with access to any financial information, including tax returns, and must authorize the probation officer to conduct credit checks and obtain copies of income tax returns.

6.    You must not obtain any new credit or debt without the prior permission of the probation officer.

7.    You must abstain from the use of all alcoholic beverages.

Re:  Khan, Saleem (41918)                                                                          Page 4

It is further ordered that the defendant shall pay to the United States a special assessment of $1,000. Payments shall be made to the Clerk of U.S. District Court, 450 Golden Gate Ave., Box 36060, San Francisco, CA 94102.  During imprisonment, payment of criminal monetary penalties are due at the rate of not less than $25 per quarter and payment shall be through the Bureau of Prisons Inmate Financial Responsibility Program.

The Court finds the defendant does not have the ability to pay the fine and orders it waived.

It is further ordered that the defendant shall pay restitution to Ross Stores, Inc., Attn: Ken Jew, Group Senior Vice President, General Counsel & Corporate Secretary, CR17-00385 Restitution, 5130 Hacienda Drive, Dublin, CA 94568 (925-965-4848) in the amount of $649,203. During imprisonment, payment of restitution is due at the rate of not less than $25 per quarter and payment shall be through the Bureau of Prisons Inmate Financial Responsibility Program.  Once the defendant is on supervised release, restitution must be paid in monthly payments of not less than $1,000 or at least 10 percent of earnings, whichever is greater, to commence no later than 60 days from placement on supervision. Any established payment plan does not preclude enforcement efforts by the US Attorney's Office if the defendant has the ability to pay more than the minimum due. The restitution payments shall be made to the Clerk of U.S. District Court, Attention: Financial Unit, 450 Golden Gate Ave., Box 36060, San Francisco, CA 94102.  The defendant's restitution obligation shall be paid jointly and severally with other defendants in this case until full restitution is paid.  The Court gives notice that this case involves other defendants who may be held jointly and severally liable for payment of all or part of the restitution ordered herein and may order such payment in the future, but such future orders do not affect this defendant's responsibility for the full amount of the restitution ordered.

Respectfully Submitted,

Anthony Castellano
Chief U.S. Probation Officer


By: Jessica A. Goldsberry
        U.S. Probation Officer Specialist


Approved:


Joan  Vazquez-Santiago
Supervisory U.S. Probation Officer