1   DAVID L. ANDERSON (CABN 149604)
    United States Attorney
2
    HALLIE HOFFMAN (CABN 210020)
3   Chief, Criminal Division

4   KYLE F. WALDINGER (CABN 298752)
    MATTHEW L. McCARTHY (CABN 217871)
5   Assistant United States Attorneys

6        450 Golden Gate Avenue, Box 36055
         San Francisco, California 94102-3495
7        Telephone: (415) 436-6830/(415) 436-6838
         Facsimile: (415) 436-7234
8        E-mail:       Kyle.Waldinger@usdoj.gov
                       Matthew.McCarthy@usdoj.gov
9
    Attorneys for the United States of America
10

11              UNITED STATES DISTRICT COURT

12            NORTHERN DISTRICT OF CALIFORNIA

13                   OAKLAND DIVISION

14
    UNITED STATES OF AMERICA,            )  Case No. CR 17-0295 HSG
15                                       )
              Plaintiff,                 )  **UNITED STATES' SENTENCING
16                                       )  MEMORANDUM**
         v.                              )
17                                       )
    SALEEM KHAN,                         )  Sent. Date:   July 29, 2019, 1:00 p.m.
18                                       )  Court:        Hon. Haywood S. Gilliam, Jr.
              Defendant.                 )
19  _____ )

20

21

22

23

24

25

26

27

28

## TABLE OF CONTENTS

I.     INTRODUCTION ..................................................................................................1

II.    OFFENSE CONDUCT .........................................................................................1

III.   THE PARTIES' PLEA AGREEMENT AND THE GUIDELINES CALCULATIONS..............5

IV.    SENTENCING RECOMMENDATION ...........................................................9

A.     The Nature and Circumstances of the Offenses and the Need to Impose a Sentence that Reflects the Seriousness of the Offenses ..................................................10

B.     The History and Characteristics of the Defendant ............................................11

C.     The Need to Promote Respect for the Law, to Protect the Public, and to Provide Just Punishment and Adequate Deterrence ............................................................12

V.     RESTITUTION.................................................................................................13

VI.    FORFEITURE ...................................................................................................15

VII.   CONCLUSION .................................................................................................16

1

## TABLE OF AUTHORITIES

2

**Cases**

3

4      *United States v. DeGeorge*,
           380 F.3d 1203 (9th Cir. 2004) .......................................................................... 14

5      *United States v. Goffer*,
           721 F.3d 113 (2d Cir. 2013).............................................................................. 10

6      *United States v. Gordon*,
           393 F.3d 1044 (9th Cir. 2004) .......................................................................... 14

7      *United States v. Gupta*,
           904 F. Supp. 2d 349 (S.D.N.Y. 2012)............................................................. 12

8      *United States v. Gupta*,
           925 F. Supp. 2d 581 (S.D.N.Y. 2013)............................................................. 14

9      *United States v. Heffernan*,
           43 F.3d 1144 (7th Cir. 1994) ........................................................................... 12

10     *United States v. Lench*,
           806 F.2d 1443 (9th Cir. 1986) ............................................................................ 8

11     *United States v. Martin*,
           455 F.3d 1227 (11th Cir. 2006) ....................................................................... 12

12     *United States v. Nosal*,
           844 F.3d 1024 (9th Cir. 2017) .................................................................... 14, 15

13     *United States v. O'Hagan*,
           521 U.S. 642 (1997).......................................................................................... 10

14     *United States v. Thorson*,
           633 F.3d 312 (4th Cir. 2011) .............................................................................. 8

15     *United States v. Upton*,
           91 F.3d 677 (5th Cir. 1996) ................................................................................ 8

16     *United States v. Waknine*,
           543 F.3d 546 (9th Cir. 2008) ........................................................................... 14

17     **Statutes**

18     18 U.S.C. § 1348 ................................................................................................... 1, 5
       18 U.S.C. § 1349 ................................................................................................... 1, 5

19     18 U.S.C. § 3553 ................................................................................................... 9, 13
       18 U.S.C. § 3663A .............................................................................................. 13, 14

20     18 U.S.C. § 3664 ................................................................................................. 13, 14

21

22     **Rules**

23     U.S.S.G. § 1B1.2 ....................................................................................................... 5
       U.S.S.G. § 2B1.1 ....................................................................................................... 5

24     U.S.S.G. § 2B1.4 ................................................................................................... 5, 10
       U.S.S.G. § 3C1.1 ..................................................................................................... 5, 8

25     U.S.S.G. § 3E1.1 ..................................................................................................... 8, 9
       U.S.S.G. § 4A1.2 ....................................................................................................... 9

26

27

28

USA'S SENTENCING MEMORANDUM
CR 17-0295 HSG                              ii

## I.    INTRODUCTION

On January 31, 2019, pursuant to a Rule 11(c)(1)(A) and (B) plea agreement, the defendant Saleem Khan pleaded guilty to the counts in the Superseding Indictment charging him with Securities Fraud and Conspiracy to Commit Securities Fraud, in violation of 18 U.S.C. §§ 1348 and 1349.  Khan was charged with, and pleaded guilty to, participating in a multi-year insider-trading conspiracy and scheme related to the securities of Ross Stores, Inc., from which he made millions of dollars in profits.

The defendant is scheduled to be sentenced on July 29, 2019.  In anticipation of that hearing, the United States files this Sentencing Memorandum to address the offense conduct and the calculation of the Guidelines, as well as to advise the Court of its sentencing recommendation.  As discussed in more detail in Section IV, *infra*, the regularity and magnitude of Khan's trading, the period of time over which he committed his crimes, and the profits he received call for a significant sentence of imprisonment that will serve the purposes of punishment, deterrence, and promotion of respect for the law.  Accordingly, the United States requests that the Court impose a sentence of 63 months' imprisonment, which falls at the bottom of the advisory Guidelines range.  The United States also recommends that the Court impose a term of supervised release of three years and a fine of $10,000.  The government also recommends that the Court order the defendant to pay restitution to Ross Stores in the amount of $649,203.

## II.    OFFENSE CONDUCT

The PSR accurately summarizes many of the facts of this case.  *See* PSR, ¶¶ 9-28.  In short, the defendant Saleem Khan engaged in a long-running insider-trading conspiracy and scheme related to securities issued by the retailer Ross Stores, Inc., headquartered at that time in Pleasanton.  Ross Stores' securities were traded on the NASDAQ stock market under the trading symbol "ROST."  *See* PSR, ¶ 9.

Khan's admissions regarding his participation in the conspiracy and scheme are set out ¶ 2 of the Plea Agreement (doc. 152).  Khan was the so-called "tippee" in the insider-trading conspiracy and scheme.  An employee in Ross Stores' finance department, Roshanlal Chaganlal, was the so-called "tipper."  Khan and Chaganlal had been friends since the late 1990s, when they first worked together.  *See* PSR ¶ 10.  They then both worked in the corporate offices of a large supermarket chain.  *Id.*  Chaganlal later hired Khan to work at Ross Stores as a contractor in its finance department, where Khan then worked from approximately December 2007 to April 2008.  *Id.*  Throughout the period charged in

the Superseding Indictment, Khan and Chaganlal routinely spoke on the phone numerous times per day and had lunch several times per week.  *See* PSR, ¶ 14.  It was during these many regular phone conversations and meetings that Khan and Chaganlal discussed the information about Ross Stores' financial performance to which Chaganlal had access by virtue of his position in the company.

The insider-trading conspiracy between Khan and Chaganlal began no later than in or about the summer of 2009.  *See* PSR, ¶¶ 14 & 18.  By then, Khan had left his contractor position at Ross Stores and was working in the finance department of a large health care provider.  *See* PSR, ¶ 10.  That summer, Chaganlal came across a confidential Ross Stores document prior to its public release.  He and Khan discussed the importance of the information in the document and how they could make money on it.  Chaganlal obtained $17,000 from his wife (based on a false representation to her that he owed money to Khan), and those funds were ultimately deposited into the nominee brokerage account held in Khan's brother-in-law's name, an account which Khan controlled.  *See* PSR, ¶ 18[1]; *see also id.*, ¶ 17 (noting that "Khan admitted to FBI agents he had full control" of brother-in-law's brokerage account).

After that time, Khan traded in ROST options (both calls and puts) after Chaganlal gave him confidential sales figures in advance of Ross Stores' public monthly sales and quarterly earnings announcements.  Khan's ROST options trading usually – but not always – generated large illegal profits. *See* Ex. 1 (last column, summarizing results of options trading around each announcement).  (Khan also had engaged in some options trading in ROST prior to the summer of 2009, but the volume, frequency, and regularity of that trading was not as great as that which occurred after that summer.)

Although the inception of the conspiracy and scheme appears to have been precipitated by Chaganlal's happenstance discovery of a confidential Ross Stores document, *see* PSR, ¶ 18, the conspiracy and scheme primarily exploited confidential, non-public, material, sales figures to which Chaganlal had regular access as part of his job.  Chaganlal's main avenue for accessing this information was the company's internal "flash" sales intranet page, which was available to him daily on the

---

[1]  The PSR incorrectly states that "two $8,500 cashier checks were deposited into the Bank of America account" belonging to Chaganlal's wife.  PSR, ¶ 18.  In truth, Chaganlal's wife has stated that she bought the cashier's checks at a Bank of America branch with cash consisting of her "rainy day" money.  These two cashier's checks were deposited into Khan's brother-in-law's Bank of America account.  Those funds were transferred from that account to Khan's brother-in-law's brokerage account.  As correctly noted in ¶ 18 of the PSR, Khan later used the funds to trade in ROST options.

1   company's internal network from his work computer.  This "flash" page contained a monthly running

2   total of sales and, importantly, compared the company's actual month-to-date sales to internal company

3   forecasts and to prior months' sales.  PSR, ¶ 11.  The difference between (1) what Ross Stores had

4   forecast (a proxy for what the public was forecasting or what the general market sentiment was

5   regarding the company) and (2) what had come to fruition – as well as "raw" information about how

6   Ross Stores' current monthly sales compared to the prior month or to the same month the prior year –

7   proved to be very valuable to Khan because he was able to know in advance of Ross Stores' monthly

8   sales figures announcements what those figures were and could estimate how likely they were to affect

9   the price of the company's stock.  *Cf.* PSR, ¶ 13.  It was a violation of Ross Stores' policies and of a

10  duty of trust and confidence that Chaganlal owed to the company for him to provide the confidential

11  information from the "flash" page to Khan knowing that Khan intended to trade on it.  PSR, ¶ 12.

12      A summary of Khan's trading is set forth in a document prepared by the government as part of

13  its investigation that it has referred to as the "Matrix."  The Matrix sets forth a summary of each episode

14  of Khan's ROST options trading from August 2009 to November 2012.  *See* Ex. 1 ("Matrix – Part I")

15  (internally marked as "Exhibit 160").  Each row of the Matrix contains information regarding ROST

16  options trading conducted by Khan before and after Ross Stores' monthly sales and quarterly earnings

17  announcements.  The scheme is exemplified by the three-plus-year-long pattern of (a) inside information

18  known to Chaganlal (Matrix column 1) followed by (b) Chaganlal passing on that information to Khan

19  (Matrix column 2) followed by (c) options purchases by Khan (Matrix columns 3, 4, and 5) followed by

20  (d) Ross Stores' public announcements (Matrix column 6) followed by (generally) (e) trading gains by

21  Khan after he exercised his options (Matrix columns 7 and 8).  *See* Ex. 1; *cf. also* PSR, ¶ 13.  During

22  that period, there were only three quarters and three months that Khan did not place bets on Ross Stores

23  options.  *See* Ex. 1, at 5, n.5.  As set forth in ¶¶ 13 and 16 of the PSR and in more detail in Exhibit 2, an

24  analysis of Khan's brokerage accounts (including the nominee account in his brother-in-law's name)

25  shows an extraordinary disparity in the size and value of Khan's investing in Ross Stores options in

26  comparison with his investing in other options.  *See* PSR, ¶ 16 (noting that in 2011 Khan bet 56 times

27  more on ROST options than on those of TJ Maxx, a similar retailer); Ex. 2, at 5 (internally marked as

28  "Exhibit 50") (showing that TJX was second-most-traded option, after ROST).  Clearly, Khan was

extraordinarily confident of the likelihood of his success in trading ROST options as compared to those of other companies.  Overall, Khan's ROST options trading resulted in more than $8 million in trading profits (although, on occasion, he suffered great losses).  *See* Ex. 1, at 5; PSR, ¶ 13.

Khan provided cash and other things of value to Chaganlal as part of the conspiracy and scheme. As discussed in the PSR and Section III, *infra*, Khan used an intermediary (A.A.) to give Chaganlal $55,000 in February and March 2012.  *See* PSR, ¶¶ 19-20.  At the time, Chaganlal's current home in Dublin was threatened by foreclosure, and he and his wife were attempting to purchase a new home. Chaganlal and his wife used the money that Khan gave them through A.A. as part of the down payment on the new home and to pay taxes incurred by Chaganlal's cashing in of employee stock grants.  *See* PSR, ¶ 19.  When Chaganlal needed additional funds in August 2012 to complete the home purchase, Khan gave $75,000 to another intermediary – T.L. – and that person loaned it to Chaganlal.  *See* PSR, ¶ 21.  (Unlike the money funneled to Chaganlal through A.A. in early 2012, Chaganlal was *not* aware at the time that the funds that T.L. loaned to him originated from Khan; Chaganlal knew only that Khan had assisted in finding someone to make the loan.)  Other than the money that Khan provided to Chaganlal through A.A. and T.L., Chaganlal appears to have received relatively little financial benefit from the scheme (*i.e.*, less than $200,000), at least in comparison to Khan's profits.  *See* PSR, ¶ 15.[2]

Khan, Chaganlal, and two other individuals were sued for insider trading by the Securities and Exchange Commission ("SEC") in 2014.  *See SEC v. Khan et al.*, CV 14-2743 HSG.  In September

---

[2]  Both the FBI and Khan's employer identified a spreadsheet on Khan's work computer documenting (a) Chaganlal's initial $17,000 investment in the scheme, (b) options contract purchases made by Khan on Chaganlal's behalf, and (c) subsequent payments to, or for the benefit of, Chaganlal. *See, e.g.*, Ex. 3, at 1 (listing "Original Invesments" [sic] as "17,000") (internally marked as Ex. 272). The spreadsheet is entitled "HSOR" ("Rosh" backwards).  The spreadsheet lists the following payments:

- 2025 entry for "Gold & Silver," *see* Ex. 3, at 1, related to Khan's January 2011 provision of a cashier's check in the amount of $2,025 payable to the Gold and Silver Pawn Shop, for the repurchase of numerous items of jewelry pawned by Chaganlal;

- 1,500 and 100 entries for "Send to Dipak" and "Dipak," *see* Ex. 3, at 1, related to Khan's February 2011 wire of $2,500 to Chaganlal's brother in South Africa; and

- 3,400 entry for "Costco earing," *see* Ex. 3, at 1, related to Khan's December 2010 ~$3,350 purchase of a set of earrings for Chaganlal to give to his wife.

(The "HSOR" spreadsheet does not document the February and March 2012 payments to Chaganlal through A.A. because Khan's employment with the health care provider on whose computer this spreadsheet was found was terminated in early February 2012.)

USA'S SENTENCING MEMORANDUM
CR 17-0295 HSG                                      4

2016, Khan settled with the SEC and agreed to disgorge $7,493,000 in trading profits, along with a penalty in an equivalent amount and interest of $846,147, for a total of $15,832,147.  He did not admit to the allegations of insider trading.  *See* CV 14-2743 HSG, docs. 135 & 138.[3]

### III.    THE PARTIES' PLEA AGREEMENT AND THE GUIDELINES CALCULATIONS

On January 31, 2019, Khan entered guilty pleas to Counts One through Ten of the Superseding Indictment pursuant to a Rule 11(c)(1)(A) and (B) plea agreement.  The Plea Agreement contains a detailed factual basis setting forth facts that show that Khan was guilty of the offenses to which he was pleading guilty.  *See* Plea Agrm., ¶ 2, at 3-5.  In the Plea Agreement, the parties agreed on a set of Guidelines calculations pertaining to the base offense level and to the enhancement for Khan's gain.  *See id.*, ¶ 7, at 6.  The parties agreed, however, that the government would be able to seek an additional enhancement for obstruction of justice under U.S.S.G. § 3C1.1.  *See* Plea Agrm., ¶ 7, at 6-7.

The applicable Guideline provision for the offense of conviction is U.S.S.G. § 2B1.1(a)(1).[4] Pursuant to that section, the base offense level is level 7.  *See* PSR, ¶ 32.  This base offense level should receive two enhancements: (1) one of 18 levels for a gain of more than $3,500,000, pursuant to U.S.S.G. § 2B1.1(b)(1)(J), and (2) another of two levels for obstruction of justice, pursuant to U.S.S.G. § 3C1.1. These enhancements are discussed in more detail below.

**Gain Exceeded $3,500,000.**  The United States discussed Khan's trading in options of Ross Stores in Section II, *supra*.  Based on the facts of this case, the Guidelines loss amount easily exceeds $3,500,000.  In addition, the defendant agreed in the Plea Agreement that an enhancement for a gain in excess of $3,500,000 was appropriate.  *See* Plea Agrm., ¶ 7, at 6.  Accordingly, this justifies an 18-level enhancement in the offense level.  *See also* PSR, ¶ 33.

**Obstruction of Justice.**  The government has shown, and the PSR finds (¶ 36), that Khan

---

[3]  Presumably, the $7.493 million amount was driven by the SEC's calculations of Khan's gains in ROST options.  The government's gain calculations in this case are summarized in Exhibit 1.  The government stands behind those calculations, which are based on the trading in specific brokerage accounts during a specific period of time.

[4]  Although U.S.S.G. § 2B1.4 is entitled "Insider Trading," that section does not apply to the offenses of conviction.  Khan was charged under 18 U.S.C. §§ 1348 and 1349.  The Appendix to the Guidelines instructs that, for § 1348, the applicable section is U.S.S.G. § 2B1.1.  Because § 1B1.2(a) instructs the Court to "[r]efer to the Statutory Index (Appendix A) to determine the Chapter Two offense guideline, referenced in the Statutory Index for the offense of conviction," the Court must use § 2B1.1. The government has confirmed this interpretation with the Commission's helpline.

1    willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with

2    respect to the investigation of the insider-trading scheme.  The defendant did this in several ways.

3        *First*, Khan obstructed justice by encouraging A.A. and Chaganlal to create purported loan

4    agreements in late 2012 or early 2013 (10 or more months after the transfers to which they related),

5    which each of them submitted in response to SEC subpoenas.  *See* PSR, ¶ 27; Ex. 4 (loan agreements)

6    (internally marked as Ex. 174).  By encouraging A.A. and Chaganlal to create these agreements, Khan

7    meant to make A.A.'s provision of $55,000 to Chaganlal's wife in early 2012 appear to be true loans

8    from A.A.  In truth, those funds simply had been funneled to Chaganlal by Khan through A.A.  *See* PSR,

9    ¶¶ 19-20.  There is no evidence from the early 2012 period that anyone believed then that Chaganlal or

10   his wife had any obligation to repay A.A.  Indeed, the circumstances of those transfers – including the

11   occasion in February 2012 when Khan, Chaganlal, and A.A. met together to swap checks, *see* PSR, ¶ 19

12   – made it apparent that A.A. was not out of pocket and that the money had originated from Khan.[5]

13       *Second*, in addition to counseling A.A. and Chaganlal to create the loan agreements, Khan also

14   obstructed justice by providing $20,000 to Chaganlal's sister-in-law in early 2013 for her to send to

15   Chaganlal's wife after the former returned to her home in Australia, all so that Chaganlal's wife could

16   use those funds to repay one of the purported "loans" from A.A.  *See* PSR, ¶ 27.  (Indeed, those funds

17   made up the bulk of a $22,000 check that Chaganlal's wife wrote to A.A. on February 1, 2013.[6])  By

18   providing these funds for use in a "loan repayment," Khan attempted to create the false impression that

19   A.A.'s provision of funds to Chaganlal's wife in early 2012 were true loans that Chaganlal and his wife

20   were obligated to repay.  The false impression that Khan was trying to create did not reflect reality.

21       Both actions discussed above were taken *after* FBI agents interviewed Khan and *after* SEC

22   attorneys interviewed Chaganlal in October 2012.  During those interviews, the topic of funds provided

23

---

24       [5]  Other contemporaneous evidence from February 2012 indicates that neither A.A. nor
     Chaganlal conceived of the money being given by A.A. to Chaganlal as a loan.  Specifically, one of the
25   checks given by A.A. to Chaganlal bore the note "loan repayment for Dec 2011."  *See* Ex. 5, at 2
     (redacted checks and deposit tickets) (internally marked as Ex. 184).  (A.A. has told the government that
26   the writing on the memo line of this check is not his, and that it could be Khan's.)  In other words, the
     face of that check indicates that it represents almost the *opposite* of a loan from A.A. to Chaganlal.  (In
27   truth, of course, the memo line did not accurately describe the purpose of the check, either.)

28       [6]  The government has learned that, after depositing the check, A.A. provided the $22,000 to his
     attorney, who gave those funds to Khan's attorney later in 2013.

USA'S SENTENCING MEMORANDUM
CR 17-0295 HSG                              6

by Khan to Chaganlal was raised.  The agents discussed with Khan his provision of $75,000 to T.L. to loan to Chaganlal, but had *not* discussed the earlier movements of money through A.A.  *See* doc. 80-2, at 5-6 (discussing $75,000 loan).  Thus, Khan knew that investigators were interested in his provision of funds to Chaganlal, but that they may not know about his use of A.A. as an intermediary to get funds to Chaganlal.  By attempting to make A.A.'s transfers of money to Chaganlal appear to be legitimate loan transactions, Khan was apparently trying to keep investigators from inquiring further about those transfers and therefore prevent them from discovering that *Khan* was the ultimate source of those funds.

*Third*, Khan obstructed justice by virtue of his response to the SEC's February 2013 subpoena to him for records.  One of the subpoena requests was for documents relating to "transfers of funds . . . between or among [Khan, Chaganlal, A.A., and others]."  *See* PSR, ¶ 28; Super. Ind., ¶ 22.  (Chaganlal is identified as "Co-conspirator 1" and A.A. is identified as "Individual 2" in the Indictment.)  In response to this subpoena, Khan provided hundreds of pages of documents.  Although Khan included in his March 22, 2013, production to the SEC monthly bank statements from the Citibank account where the money to pay A.A. in February and March 2012 originated, and although Khan included some cancelled checks in his production, he did *not* provide the $35,000 check numbered 122 that he wrote to A.A. on February 28, 2012.  PSR, ¶ 28; *see also id.*, ¶ 19 (discussing check number 122).  The government has obtained evidence showing that Khan did in fact receive check 122 from Citibank on or about March 2, 2013, when he was gathering documents to respond to the SEC's subpoena.  *See* PSR, ¶ 28; *see also* Ex. 6 (Citibank production letter and copy of check 122 provided by Citibank to Khan; produced to government in January 2019 along with bank statements and other cancelled checks) (redacted).[7]  There is no dispute that this check was not included in Khan's production of Citibank documents to the SEC.  *See* Ex. 7 (cover letter included in Khan's production to SEC, along with oldest cancelled check included in production); Ex. 8 (FBI FD-302 documenting interview with Citibank employee in which employee clarified that check number 122 was provided to Khan, although Citibank initially provided government with draft version of letter to Khan on 1/18/2019, instead of the copy of the letter that is in Exhibit 7).  Based on these facts, it is clear that, in response to the SEC subpoena,

---

[7]  Prior to January 2019, Citibank had told the government that it was unable to locate either a copy of the records that it had provided to Khan in 2013 or its cover letter to Khan.  *See* doc. 80-3.

1   Khan requested bank statements and cancelled checks from Citibank to produce to the SEC.  Those

2   records, which included check number 122, were provided to Khan in early March 2013.  *See* Ex. 7.

3   Before providing those records to his attorney for production to the SEC, Khan pulled out check number

4   122 (among other checks), so that when his counsel produced documents to the SEC on March 22, 2013,

5   that check was not in the production.[8]  Khan took this action for the same reason he counseled A.A. and

6   Chaganlal to create the purported loan agreements: he did not want investigators to learn about his

7   provision of money to Chaganlal through A.A. because that act would lead investigators to suspect that

8   Khan was providing financial benefits to Chaganlal in exchange for material, non-public information.

9       Based on Khan's instructions to A.A. and Chaganlal to create the loan agreements, his provision

10  of funds to Chaganlal's sister-in-law in order to make at least one of the A.A.-Chaganlal "loans" appear

11  legitimate, and Khan's concealment of check number 122 from the SEC, the government submits that

12  the Guidelines offense level should increased by two additional levels for obstruction of justice,

13  pursuant to U.S.S.G. § 3C1.1.  *See* PSR, ¶¶ 27-28 & 36; *see also* U.S.S.G. § 3C1.1, n.4(C) ("producing

14  . . . a false . . . document or record during an official investigation") & n.4(D) (". . . concealing . . .

15  evidence that is material to an official investigation") (items from non-exhaustive list of examples of

16  types obstructive conduct under § 3C1.1); *cf. also United States v. Lench*, 806 F.2d 1443, 1445 (9th Cir.

17  1986) (concealment of documents from grand jury could constitute violation of § 1503 obstruction

18  statute); *accord United States v. Thorson*, 633 F.3d 312, 321 (4th Cir. 2011) (creation of documents to

19  thwart IRS investigation and producing previously falsified documents in response to subpoena

20  warranted § 3C1.1 enhancement); *United States v. Upton*, 91 F.3d 677, 688 (5th Cir. 1996) (§ 3C1.1

21  obstruction enhancement properly based in part on failure to produce documents ordered by subpoena).

22      **Acceptance of Responsibility Reduction.**  The defendant has manifested an acceptance of

23  responsibility for his crimes.  Accordingly, he is entitled to a two-point reduction under U.S.S.G.

24  § 3E1.1(a).  However, given the timing of the defendant's pleas of guilty shortly before the scheduled

25

26          [8]  Check number 122 funded A.A.'s provision of $35,000 in two checks written to Chaganlal's
    wife in February 2012.  The additional $20,000 that Khan provided to A.A. in March 2012 to give to
27  Chaganlal's wife was in the form of a cashier's check purchased with funds from Khan's bank account.
    Khan was not provided a copy of this cashier's check by Citibank.  Although it is a fair assumption that
28  Khan otherwise did possess records regarding this cashier's check, the government does not rely on his
    failure to produce those records to the SEC in arguing for an obstruction-of-justice enhancement.

USA'S SENTENCING MEMORANDUM
CR 17-0295 HSG                          8

1   trial, the government declines to recommend the third point for acceptance of responsibility under

2   U.S.S.G. § 3E1.1(b).  *See also* PSR, ¶ 38; Plea Agrm., ¶ 7.

3        Based on the above, the total offense level is level 25.  The defendant is in criminal history

4   category II.[9]  This establishes a Guidelines range of 63 to 78 months' imprisonment.

5   **IV.   SENTENCING RECOMMENDATION**

6        In determining the appropriate sentence in this case, 18 U.S.C. § 3553(a) directs the Court to

7   consider the following factors:

8        (1)     the nature and circumstances of the offense and the history and characteristics of
             the defendant;

9

10       (2)     the need for the sentence imposed—
             (A)     to reflect the seriousness of the offense, to promote respect for the law,
             and to provide just punishment for the offense;

11

12           (B)     to afford adequate deterrence to criminal conduct;

13           (C)     to protect the public from further crimes of the defendant; and

14           (D)     to provide the defendant with needed educational or vocational training,
             medical care, or other correctional treatment in the most effective manner;

15       (3)     the kinds of sentences available;

16       (4)     the kinds of sentence and the sentencing range established for—
             (A)     the applicable category offense committed by the applicable category of

17       defendant as set forth in the guidelines . . . .

18       (5)     any pertinent policy statement . . . .

_____

19      [9]  Khan may argue that CHC II over-represents the seriousness of his criminal history because
his prior conviction in case number CR 12-0860 YGR was related to the instant offenses.  However, the

20   only factual overlap between the two sets of offenses is that Khan's misstatements to the bank in the
prior case were proven, in part, by the fact that he had made hundreds of thousands (indeed millions) of

21   dollars in trading gains.  Specifically, in the prior case, Khan (1) falsely told the bank that he had lost his
job at the end of 2007 and was not able to secure a stable job until July 2010; (2) gave pay statements

22   falsely indicating that he was employed by AB Star Group and had a bi-weekly net salary of about
$1,900; and (3) provided an income and expense statement falsely reflecting a monthly income of

23   $4,117, which statement did not disclose his significant trading gains.  Although the bank fraud conduct
occurred during the same period that Khan was committing securities fraud, the prior charges related to

24   a different kind of criminal conduct than that exemplified in the instant case, *i.e.*, Khan's defrauding of
PNC Bank and E-Trade Bank to obtain forgiveness of about $300,000 of a home equity line of credit vs.

25   Khan's participation in an insider-trading scheme.  That the proof of Khan's criminal culpability in the
CR 12-0860 YGR case may have included the fact that he made large gains by trading in ROST options

26   does not mean that the prior offense "is part of the instant offense" for purposes of calculating criminal
history.  *See* U.S.S.G. § 4A1.2, n.1.  Khan's bank fraud conviction is clearly a "prior conviction."  *Id.*

27      If anything, the fact that Khan was committing two different kinds of fraud offenses at the same
time suggests that it is entirely appropriate to consider Khan's prior bank fraud conviction in calculating

28   his criminal history score and in determining that CHC II adequately represents Khan's criminal history.

(6)      the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7)      the need to provide restitution to any victims of the offense.

Based on a consideration of these factors, the United States submits that a sentence of imprisonment of no less than 63 months, coupled with a three-year term of supervised release and a restitution order, is sufficient, but not greater than necessary, to comply with the factors set out above.

## A.      The Nature and Circumstances of the Offenses and the Need to Impose a Sentence that Reflects the Seriousness of the Offenses

As an initial matter, the offense conduct was serious and involved the defendant's longstanding and significant participation in an insider-trading conspiracy and scheme.  Insider trading is a "sophisticated fraud."  U.S.S.G. § 2B1.4, Background (2018).  It undermines confidence in the integrity of the United States' financial markets, harms ordinary investors who follow the rules, and violates the confidence of companies and shareholders whose information is misappropriated.  Because it is a serious breach of trust, and because of its damaging effects, insider trading calls for a substantial sentence.  *See United States v. O'Hagan*, 521 U.S. 642, 659 (1997) (noting "inhibiting impact on market participation of trading on misappropriated information"); *United States v. Goffer*, 721 F.3d 113, 132 (2d Cir. 2013) (stating that insider-trading defendant's "corrosive influence on the integrity of the financial markets and on the expectation of trust and confidence . . . required a significant punishment").

As set forth in footnote 9, the insider-trading conspiracy and scheme in this case was not Khan's only deviation from the straight and narrow.  But even if one considers Khan's two sets of criminal conduct as one, they represented a lengthy detour from a law-abiding life.  Khan first opened the nominee account in his brother-in-law's name in 2008.  PSR, ¶ 17.  The conspiracy and scheme began no later than mid-2009, continued until the fall of 2012, and stopped only after Khan learned that the FBI and SEC were investigating his ROST options trading.  During those years, Khan actively traded in ROST options and placed about $30 million dollars of bets on those options during that period.  *See* Ex. 2, at 3-6.  This was not a crime that involved a momentary lapse in judgment or a single decision point; the illegal trading required a deliberate, consistent, and pervasive effort.

Moreover, Khan's crimes were motivated by greed, not necessity.  Khan was gainfully employed

1   in the finance department of a large health care provider, for which he earned a good salary and

2   (presumably) received excellent fringe benefits.  *See* PSR, ¶ 59 (documenting salary of $155,000).

3         Finally, in committing his crimes, Khan's appears to have manipulated or taken advantage of

4   other individuals.  Chief among them was Chaganlal, who Khan surely knew had financial troubles and

5   would be susceptible to an invitation to engage in insider trading.  *Cf.* PSR, ¶ 24 (discussing Chaganlal's

6   financial woes and gambling).  Similarly, Khan lassoed A.A. and T.L. into serving as intermediaries

7   through which he could provide funds to Chaganlal.[10]  The PSR also documents the fact that Khan used

8   T.L. to help get him access to the brokerage account of M.K., all so that Khan could trade ROST options

9   in that account.  *See* PSR, ¶ 21.  In short, Khan used others so that he could earn millions of dollars.

10        Under these circumstances, Khan's crimes were egregious and unjustified, and they constituted

11  serious violations of the law.

12  **B.    The History and Characteristics of the Defendant**

13        This is Khan's second federal conviction.  In December 2012, a grand jury charged Khan with

14  bank fraud and with making false statements to a bank related to his defrauding of E-Trade Bank and

15  PNC Bank into forgiving his home equity line of credit on his prior residence in Dublin.  *See* PSR, ¶ 43;

16  *United States v. Khan*, CR 12-0860 YGR.  On July 25, 2013, Khan entered open pleas of guilty to both

17  charges.  *Id.*, docs. 29 & 31.  On March 13, 2014, Judge Gonzalez Rogers imposed a 21-month sentence

18  and ordered Khan to pay a $60,000 fine and $313,000 in restitution.  *Id.*, docs. 44 & 47.  (When Judge

19  Gonzalez Rogers' imposed her sentence, no allegations of insider trading had been raised.  Her sentence

20  was based on the offense conduct that Khan engaged in vis-à-vis the banks in that case, as well as on

21  Khan's educational and professional background.)  Khan was released from custody on February 4,

22  2016.  *See* PSR, ¶ 43, at 11.  (Accordingly, his supervised release ended on February 3, 2019.  *Id.*)  After

23  some delay, Khan ultimately paid his financial obligations in the prior case.  *See Khan*, CR 12-0860

24  YGR, doc. 128 (memorializing payment of fine in 4/2014 and payment of restitution in 1/2017).  As

25  noted in footnote 9, the fact that Khan was committing two types of frauds at the same time is a factor

26

27      [10]  Khan's use of A.A. and T.L. in this way is similar to his use of his nephew in the prior
     criminal case to create false documents to provide to the defrauded bank.  *See* PSR, ¶ 43, at 12 ("Mr.

28  Khan involved his nephew, [K.K.], in altering the latter's pay statements to make it appear Khan was
     employed by AB Star Group.").

1    that this Court might consider in weighing what sentence to impose for Khan's crimes.

2          The government acknowledges that the PSR raises factors that may warrant a sentence below the

3    Guidelines range, including Khan's ties to his family and the length of time that has elapsed since the

4    instant offenses.  The government has considered these factors in its recommendation for a sentence at

5    the bottom of the advisory Guidelines range.

6    **C.      The Need to Promote Respect for the Law, to Protect the Public, and to Provide Just**

7    **          Punishment and Adequate Deterrence**

8          The defendant has been convicted of what are commonly described as "white collar" offenses.  A

9    sentence of imprisonment of 63 months will promote respect for the law and will demonstrate that

10   defendants who commit securities fraud and other financial crimes – and who do so over extended

11   periods of time – will be held accountable when they break the law.

12         Promotion of respect for the law ties in with deterrence.  Cases involving white-collar crime

13   offer a special opportunity for the Court to achieve the goal of general deterrence.  A lengthy prison

14   sentence for the defendant's conduct will serve as a powerful deterrent against the commission of such

15   crimes by others.  It is important to provide this deterrent "[b]ecause economic and fraud based crimes

16   are more rational, cool, and calculated than sudden crimes of passion or opportunity," and, thus, "are

17   prime candidates for general deterrence."  *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006)

18   (quotation omitted).  "Defendants in white collar crimes often calculate the financial gain and risk of

19   loss, and white collar crime therefore can be affected and reduced with serious punishment."  *Id.*  This

20   defendant apparently calculated that, although it was illegal, obtaining material, non-public information

21   regarding Ross Stores' financial performance from his co-conspirator and leveraging that information to

22   place millions of dollars of bets on ROST securities was worth the risk.  A lengthy sentence will change

23   that calculus for other individuals who find themselves facing the choices that the defendant faced.

24         The importance of general deterrence is more significant in cases involving insider trading

25   because of the nature of the crime.  "[I]nsider trading is an easy crime to commit but a difficult crime to

26   catch.  Others similarly situated to the defendant must therefore be made to understand that when you

27   get caught, you will go to jail."  *United States v. Gupta*, 904 F. Supp. 2d 349, 355 (S.D.N.Y. 2012); *see*

28   *also United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) (Posner, J.) ("[c]onsiderations of

1   (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are

2   difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and

3   hence the punishment required to deter it.") (discussing sentencing in bid-rigging case).

4        For these reasons, consideration of 18 U.S.C. § 3553(a)(2)(B) and the need for meaningful

5   general deterrence favor a significant sentence that includes a term of imprisonment.  In addition,

6   although Khan claims that does not have the funds to pay a fine, the Court should nevertheless impose a

7   fine of $10,000, which is at the bottom of the advisory Guidelines range.  A nominal fine will also send

8   a message of general deterrence.

9        The Court should also consider specific deterrence.  Although Khan has accepted responsibility

10   for his crimes, the years-long length of the offense conduct, the fact that Khan committed *other* crimes

11   while engaged in the offense conduct, and Khan's efforts to obstruct justice suggest that there is at least

12   some danger that he will re-offend.  Unless he receives the message that such conduct will have a price

13   well beyond the time that he has already spent in custody on his prior conviction, there is a danger that

14   he will again choose to deceive or cheat in order to obtain money or to get ahead.

15   **V.    RESTITUTION**

16        Counsel for Ross Stores has submitted a request for restitution of certain investigative and other

17   costs related to the government investigation into the insider-trading conspiracy and scheme.  This

18   request is documented through detailed billing records from the law firm DLA Piper, which records

19   were attached to Ross Stores' Victim Impact Statement provided to the Court.  Based on Ross Stores'

20   submission, the PSR recommends awarding restitution to Ross Stores in an amount of $649,203.  The

21   government concurs in this recommendation, as these costs appear have been incurred as a result of the

22   criminal investigation and are recoverable under the Mandatory Victim Restitution Act ("MVRA").

23        The MVRA makes restitution to victims mandatory for specified crimes, including "an offense

24   against property" and "any offense committed by fraud or deceit," 18 U.S.C. § 3663A(c)(1)(A)(ii), "in

25   which an identifiable victim or victims has suffered a physical injury or pecuniary loss."  18 U.S.C.

26   § 3663A(a)(1) & (c)(2).  The MVRA establishes a court's authority to resolve "disputes as to the proper

27   amount or type of restitution . . . by a preponderance of the evidence," to apportion liability, to set

28   payment schedules, and to modify a restitution order previously entered.  18 U.S.C. § 3664(d)(5), (e),

USA'S SENTENCING MEMORANDUM
CR 17-0295 HSG                          13

1   (f)(2), (h), and (k).  "The district court is not required to make explicit findings to justify its restitution

2   order."  *United States v. Waknine*, 543 F.3d 546, 556 (9th Cir. 2008).  However, the Ninth Circuit has

3   noted that specific findings of fact may sometimes be necessary when there is a dispute about the proper

4   amount of restitution.  *Id.*

5       The MVRA bars sentencing courts from taking into account "the economic circumstances of the

6   defendant" in ordering restitution.  18 U.S.C. § 3664(f)(1)(A).  Courts are instead required to "order

7   restitution to each victim in the full amount of each victim's losses as determined by the court."  *Id.*  The

8   only relevant exception to that directive is that a district court need not order restitution if it "finds, from

9   the facts on the record," either that "the number of identifiable victims is so large as to make restitution

10  impracticable," or that complexities in determining the cause or amount of victims' losses would so bog

11  down the proceedings "that the need to provide restitution to any victim is outweighed by the burden on

12  the sentencing process."  18 U.S.C. § 3663A(c)(3).

13      As it pertains to Ross Stores' request in this case, the MVRA authorizes restitution orders for

14  "transportation, and other expenses incurred during participation in the investigation or prosecution of

15  the offense or attendance at proceedings related to the offense."  18 U.S.C. § 3663A(b)(4).  Other courts

16  have found that attorneys' fees such as those requested by Ross Stores here are recoverable under the

17  MVRA.  *United States v. Gordon*, 393 F.3d 1044, 1056-57 (9th Cir. 2004) (holding that "Cisco's

18  investigation costs [of $1,038,477], including attorneys' fees, were necessarily incurred by Cisco in aid

19  of the proceedings" and were recoverable under MVRA; costs included those "incurred in response to

20  five grand jury subpoenas and a number of government requests requiring Cisco to analyze vast amounts

21  of documentation and electronic information"); *see also United States v. DeGeorge*, 380 F.3d 1203,

22  1221 (9th Cir. 2004) (holding that victim's attorneys' fees incurred in "civil case were a direct result of

23  DeGeorge's criminal conduct" and affirming restitution award of $2,872,634.89); *accord United States

24  v. Gupta*, 925 F. Supp. 2d 581(S.D.N.Y. 2013) (awarding more than $6 million in restitution to

25  defendant's employer, Goldman Sachs, for attorneys' fees incurred in internal investigation of defendant

26  and in participating in investigation of defendant's co-conspirator).  *But see United States v. Nosal*, 844

27  F.3d 1024, 1047 (9th Cir. 2017) (recognizing that restitution for such losses "'may be recoverable'"

28  where the harm was the "'direct and foreseeable result' of the defendant's wrongful conduct," but

1  remanding to district court to make determination as to whether "it was reasonably necessary for [the

2  victim] to incur attorneys' and investigator's fees to participate in the investigation or prosecution of the

3  offense") (quoting *Gordon* and *Waknine*); *id.* at 1048 ("The reasonableness of the fees needs to be

4  reexamined to consider (i) whether the sizeable fee related to restitution matters was reasonable;

5  (ii) whether there was unnecessary duplication of tasks between [the victim's] staff and its attorneys

6  since the court awarded a substantial sum for the time of [the victim's] employees; and (iii) whether the

7  outside attorneys were substituting for or duplicating the work of the prosecutors, rather than serving in

8  a participatory capacity.").

9         Because the crimes of conviction were "committed by fraud or deceit" and because Ross Stores'

10  legal expenses ostensibly were reasonable and were incurred by virtue of the company's participation in

11  the investigation and prosecution of Khan and his conspirator, the MVRA applies here and the Court

12  should order Khan to pay restitution to Ross Stores.

13  **VI.    FORFEITURE**

14         The United States is filing an application seeking a Preliminary Order of Forfeiture.  Of note, the

15  government is seeking to forfeit the real property located at 5896 Annandale Way in Dublin, California.

16  *See* Super. Ind., at 7-8.  Pursuant to the Plea Agreement, the defendant has agreed to forfeit any interest

17  he has in that property.  *See* Plea Agrm., ¶ 11.  Notwithstanding that agreement, the government

18  provides the Court with the contemporaneously filed Declaration of FBI Special Agent Albert Fontana,

19  which contains detailed facts showing that the Annandale Way property "constitutes or is derived from

20  proceeds traceable to" the offenses of conviction.  As set forth in Agent Fontana's Declaration, the

21  Annandale Way property was purchased in an all-cash transaction in December 2010 for approximately

22  $1.2 million.  *See* Fontana Decl., ¶¶ 4-6.  The funds to cover the purchase price and other title and

23  escrow expenses were paid into escrow from a Bank of America account held in the name of the

24  defendant's brother-in-law.  *Id.*, ¶¶ 6-8.  Agent Fontana explains in his declaration how the Bank of

25  America funds used to purchase the Annandale Way property can be traced to the OptionsHouse

26  brokerage account held in Khan's brother-in-law's name that was controlled by the defendant Khan.  *Id.*,

27  ¶¶ 10-13.  Furthermore, the facts in Agent Fontana's declaration support the conclusion that the vast

28

1  majority of the money in that brokerage account represented profits of Khan's trading in ROST options.

2  *Id.*, ¶¶ 14-15.

3        Based on the above, the facts set forth in Agent Fontana's Declaration and the exhibits attached

4  thereto, and the defendant's agreement in ¶ 11 of the Plea Agreement, the government requests that the

5  Court enter the Preliminary Order of Forfeiture that will be requested by the government and order the

6  identified assets forfeited at the sentencing hearing.  Thereafter, the government will take steps to

7  initiate final forfeiture proceedings regarding the Annandale Way property, during which proceedings

8  other claimants to the property may contest forfeiture.

9  **VII.    CONCLUSION**

10        For the reasons set forth above, the United States respectfully requests that the Court sentence

11  the defendant Saleem Khan to a term of imprisonment of 63 months.  The Court should also order Khan

12  to serve a three-year term of supervised release.  Furthermore, the United States requests that the Court

13  order the defendant to pay restitution to Ross Stores as set forth in Section V above in the total amount

14  of $649,203, and order forfeiture of the assets that will be listed in the proposed Preliminary Order of

15  Forfeiture.  Khan should also be ordered to pay a fine of $10,000 and the special assessment of $1,000.

16

17  Dated:  July 11, 2019                          Respectfully submitted,

18                                                          DAVID L. ANDERSON
                                                             United States Attorney
19

20                                                               /s/

21                                                          _____
                                                             KYLE F. WALDINGER
22                                                          MATTHEW L. McCARTHY
                                                             Assistant United States Attorneys
23

24

25

26

27

28

USA'S SENTENCING MEMORANDUM
CR 17-0295 HSG                         16